395 So.2d 1301 (1981)
STATE of Louisiana
v.
Robert BROWN.
No. 80-KA-1641.
Supreme Court of Louisiana.
March 2, 1981.
*1305 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Alfred R. Ryder, Dist. Atty., Errol D. DesHotels, Asst. Dist. Atty., for plaintiff-appellee.
John P. Navarre, Oakdale, for defendant-appellant.
COLE, Associate Justice Ad Hoc.[*]
Defendant, Robert Brown, was charged by bill of information on April 26, 1979, with aggravated battery, a violation of La. R.S. 14:34. Defendant was found guilty as charged by an unanimous jury of six on January 12, 1980. After a pre-sentence hearing, defendant was sentenced on February 8, 1980 to ten years at hard labor. Defendant now appeals his conviction and sentence on the basis of thirteen assignments of error.

FACTS
At trial, the state adduced the following evidence. The victim, Carolee Crowder, was separated from her husband and she was living with Randy Brown, the brother of the defendant Robert Brown. Though there appeared to have been no problems between the Browns (Randy, Robert, and Robert's wife) and Carolee, there is some suggestion that Carolee's estranged husband was an irritation and Robert felt he might cause a problem for his brother. On April 23, 1979, Randy and Carolee quarreled and he left the house. Shortly thereafter, Carolee left in her own car, stopped and bought beer, then encountered the defendant, Robert, and his wife. Robert and Carolee argued, agreed to discuss the situation later, and then went their separate ways. After another brief stop, Carolee made her way to the farm where the Browns lived; it was approximately 4:30 p. m. When Carolee drove up to the Brown's house, Randy came out and the two talked. Randy returned inside and Carolee, still outside, could hear Robert arguing with Randy, trying to turn him against Carolee. When Carolee threw a beer bottle at one of the brother's cars, Randy came out of the house and began slapping her. Robert followed, exclaiming that Randy was not hitting her hard enough. Randy punched Carolee as she tried to get back into her car. Randy stopped her and continued to wrestle with and beat her while Robert stood only a few feet away, yelling. Suddenly Randy shouted, "He's got that damn gun" and the victim heard three shots. She then heard Robert's wife shout, "Robert Lee, bring that gun back in this house" and heard two more shots. The next thing the victim could remember was being helped into the hospital emergency room at 8:45 p. m. She did not see the shots fired. Until told by the hospital personnel, the victim did not realize there was a puncture wound to her forehead which had been caused by a bullet that pierced into her skull and entered her brain.
Nurse Lois Taylor was on duty in the emergency room and testified the victim was stable and responsive, considering her injury, and Carolee told her "Randy beat her" and "Robert shot her." The victim also made similar statements to others, including police officers. Based on Carolee's statements, Randy, who had driven her to the hospital, was arrested, as was Robert, who was taken into custody later that night at his residence.
The defendant offered a different version of the victim's shooting. Robert took the stand and denied any knowledge of any fight or shooting and insisted he was elsewhere that night. Randy Brown was called as a defense witness and insisted Carolee disliked Robert, she showed up at the Brown's farm drunk and belligerent, but there was no fight or shooting there. Randy's version of the victim's injury was that *1306 he had to drive Carolee home since she was drunk and couldn't drive herself, and after driving into town, as they were stopped at a traffic light, some unknown assailant drove up, fired a single shot and sped away. Randy said he ducked when he heard the shot and he never got a good look at the car or the occupant. He then testified when he realized Carolee was hit, he immediately drove her to the hospital emergency room. A search of the intersection where Randy said the shooting took place revealed no broken glass. Also a hospital attendant testified when taken from the car Carolee was sitting on glass but none was on her, thus seeming to indicate the glass had been broken before the victim got, or was placed, into the car.
Pursuant to the victim's statements the defendant and his brother were arrested. After their arrest a search warrant was issued for the Brown residence. Officers executed the warrant later that same night but the search failed to turn up any handguns, bloody clothing or blood stains as described in the warrant. Officers did find and seize glass fragments from the driveway that were the same type as those from the broken window in defendant's car.
Though no handgun was found at the Brown residence, Mrs. Brown later gave the police a .22 caliber pistol. Since the bullet could not be retrieved from the victim's brain, and in any event was shattered, no tests were run to determine if the .22 was in fact the weapon used in the shooting.
When admitted to the hospital the victim was said to be suffering numerous bruises and contusions about her face but the main injury was said to have been a close gunshot wound to the right frontal region of the forehead. The gunshot left powder burns on the victim's forehead indicating that it was fired from only inches away. She survived but due to her injury she required lengthy hospitalization and continues to suffer from partial paralysis.

ASSIGNMENT OF ERROR NO. 1
By this assignment defendant asserts the trial court erred when it failed to grant his motion to quash the general and petit jury venire. The basis for defendant's motion was that the jury venire had been improperly drawn, selected and constituted.
Specifically, defendant challenges the failure of the Allen Parish Jury Commission to revise the general venire list as required by La.Code Crim.P. art. 410. Testimony from the hearing on the motion indicates the venire was selected by a random drawing from the parish list of registered voters. Robert L. Thomas, Clerk of Court, testified the names of all of the registered voters in Allen Parish were placed on paper cards and kept securely in a large barrel. From that barrel, one thousand names were selected for defendant's general venire and from those names his petit jury. Mr. Thomas also testified the cards were compiled from the voter lists and placed in the drum in either 1971 or 1972. In 1979, but before the general venire at issue here was selected, 4500 to 5000 new names from the voters registered since 1974 were added to the barrel. These names had been provided by the Registrar of Voters. Defendant's assignment notes the addition of names but focuses on the failure of the jury commission to update and revise the names already in the barrel. As defense counsel brought out in brief, neither the Clerk of Court nor the Jury Commission reviewed the names in order to eliminate those who had moved or were deceased.
Under La.Code Crim.P. art. 419 a general venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant. State v. LaRue, 324 So.2d 384 (La.1976). Defendant makes no attempt to establish fraud had been practiced or irreparable injury had been caused by the method of jury selection in Allen Parish. Rather, he appears to have based his motion to quash merely on what he perceives as a technical irregularity. In State v. Monk, 315 So.2d 727 (La.1975), this Court determined insignificant technicalities, or irregularities will not permit a composition of a jury to be set aside in absence of a showing of irreparable injury to the accused. Defendant here argues only because *1307 of the absenteeism in the general venire list that resulted from the failure of the parish jury commission to revise that list, he was denied a fair and impartial jury. Defendant fails to show how this failure to revise and eliminate cards in the barrel, or the absenteeism, affected the selection of an impartial jury. Whether deleted from the general venire list or called and found to be absent, the result was the same: those who had died or moved, did not and could not have served on defendant's jury.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment defendant contends the trial court erred in admitting hearsay testimony.
The testimony to which defendant objects was introduced into evidence during the examination of Ms. Lois Taylor, a nurse who had attended the victim at the hospital emergency room after the shooting. After questioning the witness about her treatment of the victim and the taking of the victim's medical history, the following occurred:
"Q. All right. Did you ask her anything else after that?
A. I said, `Can you tell me what happened to you'.
Q. Repeat again, if you will, what's the last question that you asked her?
A. `Can you tell me what happened to you?'
Q. And what was her response to that?
A. She said, `Randy beat me and Randy's brother, Robert, shot me.'"
Before this testimony was elicited, the trial judge, after argument of counsel and with the jury removed, had declared it admissible as part of the res gestae exception to the hearsay rule.
The testimony of Ms. Taylor was evidence of an out-of-court statement by the victim and was offered as an assertion to show the truth of matters asserted therein, i. e. that Robert had shot her, resting for its value upon the credibility of the out-of-court asserter. The testimony thus constitutes hearsay. State v. Henderson, 362 So.2d 1358 (La.1978). Hearsay is generally inadmissible except as provided by statute or one of the well-recognized hearsay exceptions. State v. Henderson, supra. One such exception is the res gestae doctrine. Under La.R.S. 15:447 res gestae is defined as events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants. This doctrine includes not only spontaneous utterances and declarations made before and after commission of a crime but also includes testimony of witnesses pertaining to what they heard or observed before, during or after the commission of the crime if the continuous chain of events is evident under the circumstances. La.R.S. 15:447 and 448. State v. Drew, 360 So.2d 500 (La.1978); State v. Batiste, 318 So.2d 27 (La.1975). The statement made by the victim to Ms. Taylor in the emergency room was part of a continuous chain of events that began when the victim was first battered. Though some three to four hours had elapsed since the shots were fired, the victim had been brought to the hospital by one of her assailants, Randy Brown, had been unconscious since the shots were fired, and was under the immediate pressure of the occurrence. The statement is thus admissible as part of the res gestae.
The statement is also admissible as an "excited utterance." Under this hearsay exception, statements made under the influence of a startling event are deemed admissible, provided there was an occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative and the statement was a spontaneous reaction to the occurrence or the event and not the result of reflective thought. State v. Henderson, supra; see, C. McCormick, Evidence § 297 at 702 (2d ed. 1972). In State v. Henderson, supra, at 1362, this Court examined the excited utterance as follows:
"Many factors enter into determining whether in fact the second requirement has been fulfilled and whether a declarant was at the time of an offered statement *1308 under the influence of an exciting event. Probably the most important of these is the time factor. In this connection the trial court must determine whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process. Several additional factors which may indicate that the statement was the result of reflective thought, but which do not automatically justify exclusion, are as follows: Evidence that the statement was self-serving or made in response to an inquiry; Expansion of the excited utterance beyond a description of the exciting event into past facts or the future; Proof that the declarant performed tasks requiring reflective thought processes between the event and the statement. See, State v. Smith, 285 So.2d 240 (La.1973); C. McCormick, Evidence, § 297 at 705, et seq. (2d ed. 1972); G. Pugh, Louisiana Evidence Law, at 515 (1974), at 208 (Supp.1976); Comment, Excited Utterances and Present Sense Impressions as Exceptions to the Hearsay Rule in Louisiana, 29 La.L.Rev. 661 (1969)."
Here, as noted above, there was an appreciable lapse of time, but the victim testified she had been beaten and shot, and upon her arrival at the hospital she was still disoriented, had been unconscious, and was obviously suffering from the trauma of the attack. Given her apparent mental and physical condition, especially the fact that, until told by hospital personnel, she did not know she had a bullet wound to the forehead, we find the time lapse was not long enough for her emotional state to diminish, or long enough to allow her to reflect on the events of the battery. Though the statement was in response to an inquiry from Ms. Taylor, the question was merely part of the patient's examination and not leading and is thus admissible as an excited utterance. The fact the statement is made in response to an inquiry does not automatically defeat this exception to the hearsay rule.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 3
By this assignment defendant urges there was error in the trial court's allowing the victim to testify she had seen the defendant carrying a pistol on many previous occasions.
During the direct examination of the victim the following exchange occurred:
"Q. Now, prior tobefore that night, had you ever seen Robert Brown in possession of a pistol or a gun?
A. Yes, everytime he went anyplace, he carried a pistol.
Q. What kind of pistol did he carry?
A. A .38.
Q. Before April 23, 1979, had you ever actually seem him with a .38 pistol or with a gun?
A. Yes.
Q. All right. Well, tell the jury where you saw him with this gun before that night, anyplace that you saw him with it.
MR. NAVARRE: Your Honor, I object to this. I don't think it's relevant as to where and when she saw him with a gun.
THE COURT: Overruled.
MR. DESHOTELS: I'll not pursue it very, very lenthy, Your Honor.
Q. Do you understand my question, Carol?
A. Yeah. Everytime he came to our apartment, he usually brought his gun."
The witness was then questioned as to how the defendant carried the weapon, what color it was and what type of pistol. The defendant asserts this testimony served only to portray him as a gun-toting bad character and was not relevant.
To be admissible, evidence must be relevant to a material issue. La.R.S. 15:435; State v. Stevenson, 390 So.2d 1292 (La.1980). Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative that commission and intent. La.R.S. 15:441. A trial judge's ruling concerning the relevancy *1309 of evidence will not be disturbed on appeal in the absence of a showing of a clear abuse of discretion. State v. Alford, 384 So.2d 761 (La.1980); State v. Echols, 376 So.2d 1244 (La.1979); State v. Weems, 358 So.2d 285 (La.1978); State v. King, 355 So.2d 1305 (La.1978). Relevant evidence may be excluded, however, if it would unduly arouse jury prejudice or hostility, create a collateral issue that would distract the jury, delay the trial, or cause unfair surprise. State v. Franklin, 353 So.2d 1315 (La.1978). The purpose of the evidence in question seems to have been to convince the jury the defendant often had a gun with him and was likely to have had it when the fight broke out between his brother and the victim. The state had already introduced the testimony of the victim where she stated that during the attack on her, the defendant's brother exclaimed "He's got that damn gun" and the defendant's wife yelled "Robert Lee, bring that gun back in this house."
A habit is relevant to show the doing of an act. (Wigmore on Evidence, § 375, 3d Ed. 1940). Moreover, the previous possession of special means, tools, apparatus and the like, may be of probative value in establishing an act requiring such means was done. (Wigmore on Evidence, supra, § 88). The state's introduction of evidence tending to show since defendant often carried a gun he did so on the day Carolee was shot was relevant and important to its case, as Carolee could not herself place a gun in defendant's hand at the time the shots were fired. In attempting to make this point to the jury, there was a risk they might consider the evidence indicative of defendant's bad character and propensity for violence. Given the threat of prejudice such evidence would carry, the probative value must have been sufficient to justify its admission. As Wigmore notes [§ 92], the probative value of habit evidence depends on the regularity of the past conduct. In this case, the probative value of Carolee's statement that defendant was armed every time he appeared at the residence turned on the number of such visits. On this record, we cannot say the trial judge's decision to admit it, after presumably conducting the crucial balancing test of probative value verses prejudicial effect, was a clear abuse of his broad discretion in admitting or excluding evidence.
This assignment is without merit.

ASSIGNMENTS OF ERRORS NOS. 4 AND 8
By these assignments defendant challenges the legality of his arrest and asserts evidence seized from his residence was both the fruit of an illegal arrest and not within an existing search warrant. He contends his arrest was illegal because no arrest warrant existed when he was taken into custody. He argues since there was no warrant, he could not be arrested because the alleged offense was not committed in any officer's presence.
Defendant fails to realize under La.Code Crim.P. art. 213, even without a warrant, a valid arrest may be made if the police had the requisite probable cause to believe he committed the charged offense. The standard for probable cause was recently enunciated in State v. Collins, 378 So.2d 928 (La.1980), where this Court reasoned:
"Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. State v. Wilkens, 364 So.2d 934 (La.1978); State v. Johnson, 363 So.2d 684 (La.1978); State v. Marks, 337 So.2d 1177 (La.1976). Although mere suspicion cannot justify an arrest, State v. Thomas, 349 So.2d 270 (La.1977), the officer does not need sufficient proof to convict. State v. Randolph, 337 So.2d 498 (La.1976).
"One of the most important elements in determining whether probable cause existed is satisfied when the police know a crime has actually been committed. When a crime has been committed and the police know it, they only have to *1310 determine whether there is reasonably trustworthy information to justify a man of ordinary caution in believing the person to be arrested has committed the crime. In many cases the police do not know that a crime has been committed. When the arrest or search is made when the police do not know that a crime has been committed, more and better evidence is needed to prove that probable cause exists for the arrest than is the case when the police know a crime has been committed. State v. Johnson, supra."
Applying the above principles to this case, it can be seen at the time of the arrest of Robert Brown the police were aware Carolee Crowder had been shot and had been told by her the defendant had done the shooting. Sergeant Virgil Lee Chamberlain of the Oakdale City Police Department testified he had questioned the victim in the emergency room and, pursuant to the information learned, proceeded to arrest Randy Brown, and then arrest Robert Brown. The victim also testified she had informed the police Robert Brown shot her. Given the victim's statements accusing the defendant and the bullet wound to her head, the probable cause standard of Collins, supra, was met. The arrest was therefore legal.
It is essential to note defendant was arrested in his home by the authorities. In Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court determined in the absence of special circumstances, warrantless arrests in the home are unconstitutional. This Court in State v. Brown, 387 So.2d 567 (La.1980), adopted Payton, supra, and also held Article 1, § 5 of the Louisiana Constitution of 1974 prohibits warrantless, non-exigent arrests in the home. However, even if the arrest here were determined to have been illegal, an illegal arrest does not in and of itself, void a subsequent conviction. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); State v. Jenkins, 338 So.2d 276 (La.1978). Moreover, any argument by the defendant that evidence seized was tainted by an illegal arrest and must be suppressed is not compelling since the police here secured a search warrant after defendant's arrest and returned to his residence to execute it. Defendant puts forth no claim the information contained in the search warrant was derived from any prior illegal police action and must therefore have been excised and, in any event, no evidence described in the warrant was seized. This Court has recently held the decision in State v. Brown, supra, was not retroactive. Since Brown was decided on June 23, 1980 and the arrest here took place on April 23, 1979, the holding in that case is inapplicable. State v. Smith, 392 So.2d 454 (La.1980).
Defendant also insists evidence consisting of glass fragments was illegally seized from his residence. The glass was found in the driveway of the defendant's residence and seized as the police were executing a search warrant. The warrant authorized the seizure of pistols or handguns, bloody clothing and blood stains in or about the house. Deputy Everett Edwards of the Allen Parish Sheriff's Office obtained the warrant the night of the offense and proceeded to the Brown residence. The search failed to uncover any handguns or bloody clothing but the officers noticed recently broken glass in the driveway and collected it. The glass was seized because the officers investigating the crime had earlier discovered a window on the victim's car had been shattered, and thus hoped to match glass found in her car with the glass found at the Brown residence. The defendant does not challenge the warrant itself, rather, he asserts the glass fragments were not described in the warrant and therefore were illegally seized.
We find defendant did not have a reasonable expectation of privacy in the driveway area of his residence. Though defendant's home is in a rural area and the driveway from the road is 100 to 150 feet long, there could be no reasonable expectation of privacy in the area where the glass was seized. There is nothing in the record to suggest the property was fenced, the driveway had a gate or easy access was otherwise denied to visitors, including the authorities. This Court determined in State v. Ragsdale, 381 So.2d 492 at 497 (La.1980):

*1311 "The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared to recognize as being reasonable. State v. Wilbourn, 364 So.2d 995 (La.1978); State v. Dupuis, 378 So.2d 934 (La.1979)."
Given the above facts, even though not a public area, the defendant could not have reasonably expected the driveway of his residence to have privacy from public view. Since there was no intrusion into defendant's privacy, the evidence was legally obtained and properly admitted. And, even assuming there was an intrusion, the seizure was valid under the plain view doctrine.
This Court has set out the following criteria before evidence may be introduced as seized pursuant to the plain view doctrine. First, there must have been a prior justification for an intrusion into the protected area. Second, the evidence must have been discovered inadvertently. Finally, it must have been immediately apparent, without close inspection, that the items seized were evidence or contraband. State v. Edsall, 385 So.2d 207 (La.1980); State v. Pomes, 376 So.2d 133 (La.1979); State v. Bouffanie, 364 So.2d 971 (La.1978); State v. Banks, 363 So.2d 491 (La.1978); State v. Parker, 355 So.2d 900 (La.1978). The execution of the valid search warrant in this case renders any intrusion justifiable. The warrant authorized access to defendant's residence, and the officers gained access in the most likely manner, by using the driveway which stretched from the road. There is nothing to suggest a planned search, and, given the previous police investigation of broken glass in the victim's car, the glass seized was immediately apparent as evidence.
These assignments are without merit.

ASSIGNMENT OF ERROR NO. 5
By this assignment defendant insists it was error for the trial court to allow the introduction into evidence of a Miranda rights form.
After defendant's arrest, he was advised of his constitutional rights, but refused to sign the rights form provided by the police to acknowledge that fact. At trial, during the direct examination of Marshal Odlie Stockman, the officer who arrested defendant, the state offered to introduce into evidence the blank rights form. Before introduction of the form the following questioning occurred:
"Q. Now, did you do anything else, insofar as this investigation is concerned, after you placed him under arrest and started to take him back to Oakdale?
A. I brought him back to Oakdale and got a Rights Form out and read him his rights.
Q. You read them the second time?
A. Yes, sir, off of the Rights Form.
Q. Now, what was his attitude towards you at that time, Mr. Stockman?
A. Well, he said it wasn't him and he wouldn't sign the Rights Form. He said he wasn't going to sign anything.
Q. Pardon?
A. He said he wasn't going to sign anything, he hadn't done anything.
Q. All right. Did you read him what the Rights Form were?
A. Yes, sir.
Q. What was his mood then? What kind of mood was he in?
A. He was talking and laughing.
Q. Did he tell you that heDid he offer to help you in your investigation in this particular case?
A. No, sir, he just said that he didn't know anything about it.
Q. Nothing at all?
A. He said he didn't know anything about it.
Q. Okay. Did he tell you whether he had seen her that night?
A. He didn't tell me. I didn't conduct the investigation. After I brought him there and read him his rights, that's about it."
The questioning then continued:
*1312 "Q. Now, after you read him his rights at the police station, did he sign them?
A. No, sir, not while I was there.
Q. And why not?
A. I don't know. He just said he wasn't signing nothing.
Q. Did you give him a chance to read them?
A. Yes, sir.
Q. Now, what purpose do you have for asking people to sign the form once you read it to them?
A. Well, that's just to show that he's been advised of his rights."
After a brief recess, there was further questioning in regard to defendant being advised of his constitutional rights and the following exchanges occurred:
"Q. Mr. Stockman, I was asking you just before we recessed concerning a Rights Form. I'm going to hand you a sheet of paper and ask you what that is?
A. It's a Rights Form.
Q. All right. Have youAre you familiar with that particular form?
A. Yes, sir.
Q. How does it compare with the form that you read to Robert Brown on the night of April 23rd.
A. They're might near identical.
Q. Okay. But I mean, was that the type of form that you used?
A. Yes, sir.
Q. All right. Did he ever sign the form that you used?
A. Not while I was there.
Q. All right. If you will, it will be easier than having them read it individually, please read what the form says.
MR. NAVARRE: Your Honor, I object. I don't see the relevancy of the Rights Form unless he plans to introduce some type of confession.
MR. DESHOTELS: Your Honor, it is relevant in this sense, first of all, the law requires that before any kind of questioning at all goes on, that the Miranda Forms be given. If anybody should know that, the defense attorney should. The second thing is this, that we want to show that the person was advised of all of the rights that he had and could have taken whatever action he wanted. And I think it's a burden upon us to show that we did this during our arrest. You can't leave it out of the record.
MR. NAVARRE: I think it's relevant only if he intends to introduce some incriminating statement made by the accused.
MR. DESHOTELS: I don't know why he doesn't want the jury to see a Rights Form.
MR. NAVARRE: Because I don't think it's relevant.
THE COURT: Well, his objection is just on relevance.
MR. DESHOTELS: Well, Your Honor, I have introduced testimony concerning the attitude of Robert Brown when he was arrested. Defense counsel, in his opening statement, made a point of saying what his attitude was. That the guy looked like he didn't care what was going on at the time that he went to Robert Brooks. I want to show the jury that he was advised of the matter and the gravity of the situation that he was presented with. If Counsel is going to raise his attitude and his nonchallance (sic) as part of his defense, then I think it's relevant for me to show to the jury underthe circumstances that he was under. He made the issue, not me.
THE COURT: Well, it may or may not beI'll let it be filed. But you can just file it and pass it amoung (sic) the jury.
MR. DESHOTELS: Pardon?
THE COURT: It's a form, is it not? It's an uncompleted form.
MR. DESHOTELS: And, also, of course, he argued in his opening statement, that the law enforcement officers didn't do their job.
*1313 THE COURT: Well, over Counsel's objection to relevance, I'll let the form be filed."
Recently, this Court in State v. Mosley, 390 So.2d 1302 (La.1980), considered the introduction of testimony regarding a defendant's notification of his rights at the time of his arrest where the state was not introducing such testimony as a predicate for the admission of a confession or inculpatory statement. In Mosley, as in the instant case, no such inculpatory statement existed. In both instances the defendant argued the evidence was irrelevant, and in Mosley that the purpose for its introduction was to call the jury's attention to the fact the defendant had remained silent after his arrest. The defendant's claim of reversible error was rejected in Mosley. This Court found the prosecutor's remarks there to have been obscure and oblique rather than a direct reference to the accused's post-arrest silence. The prosecutor asked of two different witnesses whether the defendant had been advised of his rights. Here, the questioning of Marshal Stockman and the introduction of the rights form brought the defendant's post-arrest posture more directly before the jury. However, we do not find the introduction of the rights form, coupled with the particular line of questioning, was an improper and intentional reference to the defendant's silence which resulted in prejudice to him and which denied him a fair trial. The line of questioning, to counter the defense's argument that defendant was nonchalant at his arrest, a factor indicating his innocence, is a reasonable balancing of evidentiary factors. Defense counsel, in his opening statement, had placed before the jury the defendant's nonchalant attitude at the time of his arrest. The jury, having before it this assertion, and being likely to draw inferences therefrom favorable to the defendant, could not have been unduly prejudiced by evidence tending to show defendant had been apprised of constitutional rights which carry with them the gravity of the situation. In fairness, once the inference door had been opened by the defense, the prosecution was entitled to rebut with evidence producing a contrary inference. Inferences have probative value in deciding the guilt or innocence of an accused. Here the questioning focused on defendant's "attitude" and "mood," from which relevant inferences may be drawn.
It must be noted that nowhere in the line of questioning was there a direct reference to defendant's right to remain silent. As a matter of fact, the interrogation established the defendant did not remain silent at the time he was taken into custody. He told Marshal Stockman he was not the one who committed the battery, did not know anything about the occurrence, and was "talking and laughing" during the time he was taken into custody. The "rights" form, under those circumstances, could not be interpreted as a reference to defendant's silence, but only to the several constitutional rights enunciated in Miranda, including the right to remain silent. Defendant did not remain silent. He responded with exculpatory statements. He simply refused to acknowledge he had been advised of rights which implicitly informed him of the seriousness of the situation in which he found himself.
Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), established the principle that the State cannot put on evidence with respect to the defendant's silence during time of custody in order to impeach his exculpatory trial testimony. To say the introduction of the rights form in this instance was an attempt to use defendant's silence to impeach his exculpatory trial testimony, wherein he denied any knowledge of the fight or shooting and insisted he was elsewhere, is, to say the least, far-fetched. Not only did defendant not remain silent, the pre-trial statements he made were likewise exculpatory in nature. The construction the defense places on the unsigned rights form, as evidence, is a capitalization upon a concept that could exist in the mind of a juror only if he or she were versed in the highly technical refinements of criminal law. Such is unrealistic. It is far more likely the jury accepted the evidence as it related to the quality of the defendant's attitude at the time he was taken into custody which, in turn, might form the evidentiary *1314 basis of a fair inference that defendant did or did not commit the crime. In the very least, once the jury was acquainted with defendant's attitude, it became fair game for rebuttal purposes. We cannot say defendant was prejudiced thereby. There is hardly a person who is qualified for jury duty who has not been bombarded with the role Miranda rights play in the field of criminal justice. The electronic media and the print media have afforded every American a large dose of what many feel to be an absurdity. Here, the defendant did not maintain his silence either before or during trial. The possible prejudice generated by the introduction of the right form would have to be the idea defendant remained silent to avoid incriminating himself. Assuming this occurred to the jury, it was offset by what Stockman related defendant said, combined with defendant's own testimony. Under the attendant circumstances, it is just as likely the jurors thought defendant's refusal to sign the form was nothing more than the exercise of his constitutional rights.
In Mosley, supra, this court held since the prosecutorial examination did not stress the right to remain silent or attempt to elicit testimony regarding defendant's failure to respond to police questioning, the defendant was not prejudiced. A close examination of the evidence in this matter reveals there was no emphasis placed upon the right of the defendant to remain silent. This right to remain silent was merely stated on the form along with other constitutional rights. And, there could have been no attempt by the prosecution to elicit testimony regarding defendant's failure to respond to police questioning because he did respond. What is at issue here is the defendant's refusal to acknowledge in writing he had been advised of constitutional rights, not the use of silence while in custody as a means of inferring guilt. The precepts of Mosley, and Doyle v. Ohio, are properly applied in finding no prejudice to defendant by the introduction of the rights form. The case of State v. Montoya, 340 So.2d 557 (La.1976), holding it was reversible error for the prosecutor to elicit from arresting officers the fact defendant did not respond to police questioning, is inapposite. As stated, in this instance the defendant did respond and his exculpatory response was placed before the jury.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 6
By this assignment defendant contends the trial court erred in admitting gruesome photographs into evidence.
During the examination of Officer Virgil Lee Chamberlain, the state offered into evidence photographs of the victim's car. Though the pictures are not provided in the record, they are said to portray the car from various angles and no doubt include the shattered window and the blood stains from the victim's gunshot wound. Defendant correctly acknowledges gruesome photographs may be admitted into evidence. Before this introduction, it must be determined the photographs' probative value outweighs any prejudicial effect. State v. Landry, 388 So.2d 699 (La.1980). A trial court's ruling in regard to the admission of this evidence will be disturbed only if it can be shown the prejudicial effect in fact clearly outweighs the probative value. State v. Landry, supra. It is doubtful the photographs of the vehicle as described could even be determined gruesome, much less be so prejudicial as to warrant overturning the trial court's decision to admit them. Defendant argues since similar photographs had already been introduced, these were repetitious and should have been excluded. The previous admission of similar photographs is only a factor to be considered in balancing the probative value and prejudicial effect of the photographs defendant finds objectionable. That balancing decision is for the trial judge. His decision here cannot be said to have been error.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 7
By this assignment defendant asserts the trial court erred in curtailing his questioning of a witness in regard to what crime the *1315 defendant's brother was charged with at the time of the trial.
During the cross-examination of Officer Virgil Chamberlain, defense counsel questioned him about defendant's brother, Randy Brown. Randy Brown had brought the victim to the hospital and was present when the police arrived and remained there when the victim told the police Randy had beaten her and defendant had shot her. Defense counsel elicited from the witness that Randy was arrested and charged with aggravated battery at the hospital. The witness was then asked if he knew what crime Randy Brown was presently charged with. The state objected, arguing the witness was a police officer, not a prosecutor and the answer to this question was beyond the witness' knowledge. The trial judge sustained the objection.
When a witness has been sworn and testified to any single fact in his examination in chief, he may be cross-examined upon the whole case. La.R.S. 15:280. This Court has determined the scope of cross-examination is not limited to matters covered in direct examination. State v. Constantine, 364 So.2d 1011 (La.1978); State v. Weathers, 320 So.2d 895 (La.1975). However, the general rules of evidence are applicable to determine the proper scope of cross-examination testimony. The evidence must be relevant to the material issue. La. R.S. 15:435 and 15:441. The relevancy of proffered evidence depends on whether it tends to prove or disprove a material fact. State v. Passman, 345 So.2d 874 (La.1977).
The evidence sought to be introduced by the defense regarding the current charge against the defendant's brother exceeded the proper bounds of cross-examination. It is irrelevant to the issue of the officer's actions, the brother's arrest, the victim's statements, or, most important, the defendant's own guilt. Moreover, if it is true, as defendant asserts in brief, that the charges against Randy Brown were reduced from aggravated battery to simple battery, that fact would not work in defendant's favor. Rather the reduction of charges would strengthen the case against him by lending credence to the testimony of the victim who testified Randy Brown had only punched and slapped her, while Robert was believed to have shot the pistol and inflicted the battery. In any event, the jury had already been made aware of the fact that Randy was charged with a crime when he took the stand as a defense witness.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 9
By this assignment, defendant maintains the trial court erred in failing to grant his motion for a directed verdict. Defendant had based his motion on what he perceived as an insufficiency of evidence as to the elements of the charged offense when the state rested its case. Since there are no directed verdicts in jury trials in Louisiana but only in a trial by a judge alone, La.Code Crim.P. art. 778, we will treat defendant's motion as a motion for a new trial. La. Code Crim.P. art. 851, et seq.
As noted earlier, the victim testified she was at the Brown residence when Randy Brown began to hit her. The defendant was standing near them and suddenly Randy yelled: "He's got that damn gun." The next thing the victim remembers was hearing shots and the defendant's wife yelling for him to bring the gun back in the house. The victim testified she heard five shots. The next thing the victim could recall was being in the hospital emergency room. The only witnesses to the exchange between the victim, Randy Brown and Robert Brown, testified for the defense and asserted there was no shooting at the Brown residence. Randy Brown testified the victim was shot as he drove her home, when an unidentified car pulled up next to them at an intersection and fired a single shot.
Dr. John M. Patton, the neurosurgeon who treated the victim the night of the shooting testified there were powder burns on the victim's forehead and the gunshot had been inflicted at close-range. Further, the nurse who helped the victim out of the car at the emergency room testified she was sitting on glass on the car seat and none was on her or in her lap. This witness and *1316 others also testified the victim's face was bruised and beaten. This evidence served to discredit the defense version of the facts as did the presence of glass from the victim's car at the Brown residence. The testimony of the defense witnesses, additionally, was often conflicting and inconsistent. Nevertheless, defendant asserts the circumstantial evidence and testimony was not sufficient to prove all the essential elements of aggravated battery. Particularly persuasive for defendant is the failure to identify his pistol as the one that fired the shot which struck the victim and the victim's inability to recall seeing defendant with the gun or firing it. The bullet which struck the victim's head shattered into small pieces, much of which remains in her brain and thus could not be retrieved for analysis.
This Court previously held there is a reviewable question of law only when there is a complete lack of evidence of an essential element of a crime. That standard was changed by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), where the United States Supreme Court held that in reviewing the sufficiency of evidence, the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This Court's acceptance of the Jackson reasonable doubt standard is now well-documented. State v. Morgan, 389 So.2d 364 (La.1980); State v. Harveston, 389 So. 63 (La.1980); State v. Hartman, 388 So.2d 688 (La.1980).
The evidence here presented to the jury allowed them to conclude the defendant in fact did commit the battery. In concluding defendant intentionally used force upon the victim with a dangerous weapon (La.R.S. 14:34), the jury apparently was unpersuaded by the defendant's own self-serving testimony and conscious of the conflicting testimony of the defense witnesses. Even under the stricter Jackson standard, since the evidence is viewed in the light most favorable to the prosecution, the evidence here clearly supports the jury's verdict.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 10
By this assignment defendant asserts the trial court erred in allowing a cross-examination by the state to exceed what was asked on direct.
Defense counsel had called the defendant's wife, Mrs. Pat Brown, to testify to the events of the day of her husband's arrest. When tendered for cross-examination by the state the prosecutor was allowed to question the witness at length as regards what weapons the defendant owned, where he kept them and when they had been seized. Defendant objected to this questioning, urging that it was impermissible since it exceeded the scope of his direct examination during which the subject of guns had not been broached.
The scope of cross-examination is governed by La.R.S. 15:280 which provides:
"When a witness has been intentionally sworn and has testified to any single fact in his examination in chief, he may be cross-examined upon the whole case."
See also, State v. Morgan, 367 So.2d 779 (La.1979), and State v. Weathers, 320 So.2d 895 (La.1975). Doubt as to the propriety or extent of cross-examination is resolved in favor of cross-examination. State v. George, 346 So.2d 694 (La.1977); State v. Nero, 319 So.2d 303 (La.1975). Additionally, "it is well settled that the scope and extent of cross-examination rests largely in the discretion of the trial judge and his rulings in respect thereto will not be disturbed in the absence of an abuse of discretion." State v. George, supra, at 704.
Given the relevancy of the state's questioning in regard to defendant's weapons, it does not appear the trial judge abused his discretion in overruling defendant's objection.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 11
By this assignment defendant maintains there was error in the trial *1317 court's curtailing his examination of a state witness.
Defense counsel was examining state witness Deputy Robert Vest who had testified earlier during the prosecution's case in chief and was now on the stand as a rebuttal witness. During the re-cross-examination of Deputy Vest, the defendant attempted to question him about statements made to him by the victim. Particularly, the defendant wanted to discover what caliber of pistol the victim said had been fired at her.[1] The following exchange took place:
"Q. And did she tell you what caliber pistol?
A. She really didn't know the caliber. She thought it was a .35 and that's the way I put it on her statement.
Q. A .35 or a .38?
A. That's the same thing I asked her. I said, `Could it have been a .25?' You know, she just knew that she had been shot with a pistol.
Q. Did she indicate to you that she has seen the weapon that shot her?
A. Yes, sir. She told me thatThe way that she told me..."
The state objected, asserting that the testimony was hearsay, but was overruled by the trial court and re-cross-examination continued.
"Q. You indicated the reason you were looking for a handgun was because you had talked to Carolee Crowder and she had indicated that she was shot with a handgun, is that correct?
A. Yes, sir.
Q. And she indicated that she was shot with awhat type of weapon? What type of pistol?
A. She said it was a pistol and she said it was a pistol that Robert Brown always carries with him. Not the one that Pat has but the one that RobertIt was Robert's pistol, not Pat's pistol, but Robert's pistol.
Q. And what kind was that?
A. She thought it was a .35. Now, why she come up with a caliber of .35, I don't know.
Q. Did she..."
At this point the court interrupted and determined the testimony was hearsay and there would be no further questioning on these lines; the defendant objected.
The testimony of Deputy Vest was evidence of an out-of-court statement made by the victim and was offered as assertion to show the truth of the matter asserted therein, resting for its value on the credibility of the out-of-court asserter; it thus was hearsay. State v. Henderson, 362 So.2d 1358 (La.1978). The defendant was attempting to show the jury the victim had been shot with a particular caliber bullet which could not have been fired from defendant's gun. As we have noted, hearsay is generally inadmissible except as provided by statute or by one of the exceptions to the hearsay rule. State v. Henderson, supra. The record does not reflect precisely when the victim's statements were made to Deputy Vest, but does show they had been made prior to the execution of the search warrant which occurred very late on the night of the offense. If the statements were made shortly after the offense and before the lapse of an excessive amount of time it might be argued they were admissible under the res gestae or excited utterance exceptions to the hearsay rule. However, the statements made to Officer Vest are clearly different from those made to Nurse Taylor as previously discussed herein. The statements in that earlier instance had been given as the nurse was taking the patient's history. Here they were made to the officer who was questioning the victim. Since Officer Vest was conducting an investigation and the victim's statements to him were in a narrative form, the res gestae and excited utterance doctrines do not apply.
*1318 Even if the testimony would have been admissible under those exceptions, any error in its exclusion was harmless. This conclusion is based upon the victim's testimony that she did not actually see any gun at the time of the offense (but only heard the shots), the victim's uncertainty as to the caliber of defendant's gun and also on the fact that the caliber of the bullet which entered the victim's head was never ascertained. Moreover, the actual caliber of the bullet which injured the victim was never urged by the prosecutor nor did it seem to be crucial to the state's case. While it may have been more important to the defendant, proof of the caliber would not have exculpated him. The exclusion of this testimony was not prejudicial.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 12
By this assignment defendant contends there was error in the trial court's allowing the prosecutor to make false and inflammatory statements during the state's closing argument. Particularly, the defendant now objects to remarks made by the state during its rebuttal to the defendant's closing argument.
At no time during or at the end of the state's closing argument nor during or after the rebuttal closing argument did the defendant make a contemporaneous objection. These arguments utilize seventy pages of the record. Since there was no timely objection at trial, defendant has waived his right to raise this error before this Court. As set forth in State v. Marcell, 320 So.2d 195 (La.1975), at 198:
"The contemporaneous objection rule, as embodied in Article 841 of the Louisiana Code of Criminal Procedure, is necessary in order to promote judicial efficiency and in order to prevent a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors that might easily have been corrected by objection at trial. The rule is a reasonable one when viewed in light of the Sixth Amendment right to counsel, for an accused is not forced into a trial to fend for himself, but is instead afforded the opportunity to be represented by counsel trained in the intricacies of the law. While an accused may easily be informed of or educated in some of his fundamental rights and options, such as the right to assistance of counsel, the right to a speedy trial, and the right to exercise the privilege against self-incrimination, such education is not possible when it comes to the intricate and numerous rules governing trial by judge or jury. Consequently, during the course of trial, a defendant must rely upon his counsel, and the acts and choices of counsel are deemed to be those of the defendant himself. Where it appears that counsel has failed in his professional duty toward a defendant, our system affords a defendant relief through a writ of habeas corpus alleging incompetent or ineffective counsel, in effect the deprivation of the right to the assistance of counsel. Competence or incompetence of that counsel is not before us in this appeal."
Even if defendant had made a timely objection in the trial court, the admission of the statements made by the prosecutor would not warrant a reversal. One comment defendant objects to was the prosecutor's inference that tests were not run on the weapon taken from the defendant because the tests would not have been conclusive. The same inference was made in regard to the failure to conduct paraffin tests for gun powder traces on the defendant's hands. The defendant's argument is that if the tests had been run and the results negative it would have bolstered his defense. In the state's argument the tests, despite their results, would not be conclusive of the defendant's guilt. The state does not address the issue of paraffin tests but, at trial, a state witness stated a test to see if a weapon had been recently fired cannot show when or precisely how recent the firing was.
The tests could have aided in exculpating the defendant and the blame for the failure to conduct them clearly lies with the police. However, even if the prosecutor's remarks were improper under La. Code Crim.P. art. 774, it is well settled that *1319 before a verdict will be overturned on the basis of improper argument, this Court must be thoroughly convinced the jury was influenced by the remarks and they contributed to the verdict. State v. Lee, 364 So.2d 1024 (La.1978); State v. Berain, 360 So.2d 822 (La.1978); State v. Crumholt, 357 So.2d 526 (La.1978); State v. Davis, 353 So.2d 275 (La.1977). The remarks here are of not such a character as to have caused the jury to disregard the other evidence presented or otherwise affect their verdict. This is especially true given the trial judge's charge and instructions which stressed the jurors were the sole judges of defendant's guilt and cautioned that the arguments of counsel were merely their own opinions and not evidence.
The other comments defendant now objects to are the state's references to the criminal threat to the American system of justice and the need for punishment to protect it. For example, the prosecutor stated: "I'm proud of the law enforcement that we have in Allen Parish and I hope we keep it that way. You're well aware that in this great country of ours, the system of justice that we're living under is being tried very severely." Assuming these statements are beyond the limits of La.Code Crim.P. art. 774, the jury would not have been so diverted from its task or fearful of any predicted consequences as to require reversal of defendant's conviction. Aside from any possible merit in defendant's assignment, the lack of a timely objection in the trial court requires the conclusion that this issue is not properly before this Court.[2]
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 13
By this assignment defendant asserts the trial court erred in imposing an excessive sentence.
Defendant was convicted of aggravated battery and received the maximum sentence of ten years at hard labor. Before defendant was sentenced, the trial court conducted a pre-sentence hearing and had a pre-sentence investigation report prepared. At the hearing, defendant was allowed to present witnesses who testified to his good character including the testimony of his wife about their marriage, home and four children. After the witnesses were called, the trial court proceeded to impose sentence in a lengthy discourse which included consideration of La.Code Crim.P. art. 894.1, the pre-sentence investigation report, the facts of the crime, the defendant's record and the judge's personal knowledge of and experience with the defendant. Nevertheless, defendant asserts the sentence was excessive and a violation of La.Const. Art. I, § 20 which prohibits the imposition of excessive punishment. This Court has held imposition of a sentence, though within statutory limits, may in fact violate a defendant's constitutional right against excessive punishment and the right is enforceable on appellate review. State v. Spencer, 374 So.2d 1195 (La.1979). However, the trial judge has wide discretion in the imposition of sentences, given compliance with Art. 894.1, and sentences imposed will not be set aside in the absence of manifest abuse of discretion. State v. Spencer, supra.
When reviewing a sentence for excessiveness and abuse of discretion, the trial judge's reasons for imposing sentence as required by Art. 894.1 are an essential aid to this Court. Art. 894.1 sets forth three factors which justify a sentence of incarceration and eleven factors which although not excusing the defendant's conduct, tend to *1320 lessen his culpability. The trial judge is required to state for the record both the considerations he has taken into account and the factual basis for imposition of sentence. In the instant case the trial judge's application of Art. 894.1 was thorough and unusually complete. There was no brief articulation but instead a developed and clear particularization of defendant's sentence to the crime as required by Art. 894.1. The trial judge carefully considered the crime, defendant's record (which included a previous felony conviction and other lesser convictions), the mitigating circumstances (especially defendant's family), and the outcome of defendant's action, i. e., the paralysis of the victim and the irretrievable fragments of a bullet in her brain.
The only troublesome aspect of the trial judge's imposition of sentence was his statement that he had been the judge at a previous trial of defendant for burglary and though the jury found him not guilty, the judge knew him to be guilty. This statement, though possibly improper, does not warrant overturning defendant's sentence given the otherwise careful particularization pursuant to Art. 894.1 and this Court's approval of a trial court's consideration of any information contained in a pre-sentence investigation report.
This Court determined in State v. Cox, 369 So.2d 118, 121 (La.1979), that it "... may vacate and remand for resentencing, when the reasons for an apparently severe sentence in relation to the particular offender and the actual offense do not appear in the record." (Emphasis supplied). Moreover, this Court has held that a sentence is excessive and unconstitutional if it is grossly out of proportion to the crime or it is nothing more than the needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980); State v. Goode, 380 So.2d 1361 (La.1980). In the instant case, the sentence is neither apparently severe nor grossly out of proportion to the crime.
This assignment is without merit.

DECREE
For the foregoing reasons, defendant's conviction and sentence which are the subjects of this appeal are affirmed.
AFFIRMED.
DIXON, C. J., concurs with reasons.
LEMMON, J., concurs in part, dissents in part, and assigns reasons.
DIXON, Chief Justice (concurring).
I respectfully concur, disagreeing with the treatment of Assignment of Error No. 2.
LEMMON, Justice, concurring in part and dissenting in part.
I concur in the result as to the affirmation of the conviction. I dissent, however, as to the affirmation of the sentence. I would set aside the sentence, because the trial judge articulated improper considerations as the basis for the sentence.
NOTES
[*] Judges Ellis, Cole, and Watkins of the Court of Appeal, First Circuit, participated in this decision as associate justices ad hoc, joined by Chief Justice Dixon and Associate Justices Marcus, Watson and Lemmon.
[1] On re-direct the witness testified that his investigation led him to believe the victim had been shot with a pistol and that the search warrant authorized the seizure of only handguns. The weapon of defendant's that was given to the police by his wife and which was introduced into evidence was a .22 caliber pistol.
[2] This Court has held that there are certain limited exceptions to the contemporaneous objection rule embodied in La.Code Crim.P. art. 841. Pertinent here is this Court's decision in State v. Lee, 346 So.2d 682 (La.1977), where this Court stated a prosecutor's prejudicial comments in closing argument may be considered by a federal court to violate federal due process guarantees even in the absence of a defense challenge or objection at trial. However, in State v. Lee, supra, this Court relied on United States v. Briggs, 457 F.2d 908 (2d Cir. 1972), where the Second Circuit declared that improper argument would require reversal despite a timely objection if it was "so extremely inflammatory and prejudicial" as to undermine the judicial system. The comments in the instant case do not approach the standard set forth in Briggs, supra.