540 So.2d 1144 (1989)
STATE of Louisiana
v.
Gregory GRIFFIN.
No. KA 88 0603.
Court of Appeal of Louisiana, First Circuit.
February 28, 1989.
Duncan S. Kemp, III, William M. Quinn, Tangipahoa Parish Dist. Attys. Office, Amite, for appellee.
*1145 Henry B. King, Baton Rouge, Gerard A. Rault, Jr., Loyola Law School, New Orleans, for appellant.
Before WATKINS, LANIER and LeBLANC, JJ.
LeBLANC, Judge.
Defendant, Gregory Griffin, was charged in a Tangipahoa Parish Grand Jury indictment with first degree murder, a violation of La.R.S. 14:30. He pled not guilty and was tried by jury. The trial ended in a mistrial when the jury was unable to reach a verdict. Subsequently, defendant's motion for a change of venue was granted; and the case was transferred to St. Tammany Parish. Following a second jury trial, defendant was found guilty of manslaughter, a violation of La.R.S. 14:31. Subsequently, the prosecution filed a habitual offender bill of information. After a hearing, the defendant was adjudicated a second felony offender and received a sentence of twenty-one years at hard labor. Defendant has appealed, alleging the five following assignments of error:
1. The trial court erred in denying the defendant's motion for a mistrial when a juror, Wayne McClure, stated in open court that he knew one of the State witnesses, Chester Pritchard.
2. The trial court erred in denying the defendant's motion for a mistrial based on prosecutorial misconduct in failing to disclose to the defense the relationship between Chester Pritchard and juror Wayne McClure.
3. The trial court erred in allowing a State witness, Darwin Givins, to repeat the victim's last words.
4. There was insufficient evidence to support the defendant's conviction of manslaughter.
5. The trial court erred in denying the defendant's "Motion For Authority To Record Conversations."
Shortly after 9:00 p.m. on November 1, 1985, Tangipahoa Parish Deputy Sheriff R.A. Kent was shot while investigating a complaint at Guy's Quick Stop Store located approximately four miles east of Kentwood, Louisiana. Earlier that evening, the store's owner, Marty Guy, allegedly observed defendant attempting to break into a soft drink vending machine outside the store. He telephoned the police. By the time the first officer, James Rimes, arrived at the store, defendant had driven away in his car. Marty Guy accompanied Officer Rimes as he proceeded south in pursuit of defendant. Shortly thereafter, they located and stopped defendant. Several other law enforcement personnel, including Deputy Kent, subsequently arrived at this location. To further investigate the complaint, Deputy Kent decided to return to the store. He allowed defendant to drive his car back to the store, while Deputy Kent followed in his patrol car. When they arrived at the store, Deputy Kent placed defendant in the back seat of the patrol car, but did not handcuff him.
On several occasions while Deputy Kent conferred with Marty Guy about the incident, defendant requested Deputy Kent to come over to the patrol car and talk with him. After Marty Guy decided to press charges against defendant, Deputy Kent telephoned for a wrecker to tow away defendant's car. When Deputy Kent again went over to the patrol car to speak with defendant, defendant shot him in the chest at point blank range with a twelve gauge shotgun. Deputy Kent returned fire with his revolver, firing all six shots. One of these bullets struck defendant in the shoulder. Defendant then exited the patrol car and shot Deputy Kent two more times, once in the abdomen and once in the back.
Marty Guy testified that he fled after the first shot was fired by defendant. However, he testified that he saw the shotgun blast fired by defendant (the first shot), then heard a series of gunshots as he fled. State witness, Gorman Gill, who lived approximately 250 yards east of Guy's Quick Stop, testified that he heard the exchange of gunfire that night. Another State witness, Randy Konzelman, also testified that he heard this exchange of gunfire from his residence, which is located across the street from Guy's Quick Stop. Both of these witnesses testified that they heard an initial *1146 shotgun blast, followed by six pistol shots, followed by two more shotgun blasts.
Defendant's testimony regarding the shooting was as follows. Shortly after he was placed in the back seat of the patrol car, he observed a shotgun lying on the floor and picked it up, intending to inform Deputy Kent of its existence. However, Deputy Kent overreacted and fired several pistol shots at defendant, with one shot striking him in the left shoulder. At this point, defendant was forced to return fire with the shotgun in self-defense. He shot Deputy Kent once in the chest. When he exited the patrol car and began running, Deputy Kent again fired the pistol at him, forcing him to fire the shotgun at Deputy Kent two more times. He then got into his car and fled the scene.
However, defense witness, Monroe James, defendant's first cousin, testified that, on the night of the shooting defendant came to James' house, and while there, stated that he had retrieved the shotgun from the front seat of the patrol car by pulling it over the protective screen. He also testified that defendant stated that if Marty Guy had not run away, defendant would have shot him also. Although Monroe James admitted that he and his wife had been arrested and charged with being accessories after the fact to murder for assisting defendant after the shooting, he stated that these charges had been dropped before the first trial and that his testimony was unrelated to the fact that the charges had been dropped.
Deputy Kent was transported to a local hospital, where he died later that night. Two days later, defendant surrendered to the authorities in Mississippi and subsequently gave a taped statement explaining that he had been forced to shoot Deputy Kent in self-defense.
ASSIGNMENT OF ERROR NUMBER FIVE:
In this assignment of error, defendant contends that the trial court erred in denying his "Motion For Authority To Record Conversation." Before the first trial, which took place in Tangipahoa Parish, defendant filed the instant motion seeking to surreptitiously tape-record conversations with State witnesses in an attempt to obtain exculpatory evidence. After a hearing, the trial court denied the motion.
In his brief to this Court, defendant claims that, because he was prevented from using this method to secure exculpatory evidence from the State's key witness, Marty Guy, he was uanble to fully prepare a defense and, specifically, was unable to effectively impeach Marty Guy. The whole issue revolves around La.R.S. 14:322.1, which made the surreptitious tape-recording of a conversation without the consent of all parties thereto a criminal offense.[1] *1147 In his motion, defendant requested that both defense counsel and their agents be appointed authorized agents of the State under La.R.S. 14:322.1(D)(3). Since the statute exempts law enforcement agencies or any of their authorized agents, defense counsel attempted to be appointed agents in order to circumvent the statute. The defendant also notes that La.R.S. 14:322.1 was recently declared unconstitutional by the Louisiana Supreme Court in Kirk v. State, 526 So.2d 223 (La.1988).
Defendant's motion was denied prior to the first trial in Tangipahoa Parish (21st Judicial District). Subsequently, the case was transferred to St. Tammany Parish (22nd Judicial District). After the transfer, defendant's counsel filed a motion to reurge all motions filed in the 21st Judicial District. Before the second trial commenced, the trial judge set a hearing date to consider pre-trial motions. During the hearing that followed, defendant's counsel urged a number of motions, including some of the motions that had been previously filed in the 21st Judicial District. However, defense counsel did not urge the "Motion For Authority To Record Conversation" at this time. Additionally, at the conclusion of the hearing on the pre-trial motions, defense counsel stated that he had no other pretrial motions to be considered by the court.
The record clearly establishes that the trial court did not consider the motion in question and defendant did not re-urge the motion in question. Since defendant failed to have the trial court rule upon this motion in connection with the second trial, we conclude that the motion should be deemed abandoned and, therefore, not properly before this Court. See, State v. Coates, 509 So.2d 438, 440 (La.App. 1st Cir.1987). See also, State v. Wagster, 361 So.2d 849, 856 (La.1978).
ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:
In assignment of error number one, defendant contends the trial court erred in denying his motion for mistrial when a juror, Wayne McClure, stated in open court that he knew State witness, Chester Pritchard. In assignment of error number two, defendant contends the trial court erred in denying his motion for a mistrial based on prosecutorial misconduct in failing to disclose to the defense the relationship between Chester Pritchard and juror Wayne McClure.
Before trial, the defense made an oral motion requesting the State to disclose all information, including but not limited to arrest records, voting records, and personal relationships between the district attorneys either in St. Tammany Parish of Tangipahoa Parish and all persons on the venire. The trial court expressed displeasure with oral motions, but questioned the prosecutor about the contents of the motion. Subsequently, during trial, juror Wayne McClure *1148 stated in open court that he knew State witness, Chester Pritchard. Out of the presence of the remainder of the jury, the trial court, the prosecutor, and defense counsel questioned McClure concerning his relationship with Chester Pritchard. The examination revealed that the relationship was only a slight business acquaintance.
Specifically, Mr. McClure disclosed that Chester Pritchard was not a personal friend, but that he had had several telephone conversations with him in connection with business dealings several years before. He also recounted that Chester Pritchard had been present on a hunting trip he took in Mississippi approximately three years before the trial. He stated that he did not know in advance that Chester Pritchard would be on the trip and that most of the time was spent hunting rather than socializing.
In requesting a mistrial, defense counsel expressed a concern that McClure might unconsciously give greater weight to Pritchard's testimony and might also sway other jurors to do the same. The trial court offered to replace McClure with an alternate juror but the defense refused this offer.
A juror's acquaintance with a witness for either the State or the defense is not of itself a ground for a mistrial. Ordering a mistrial is a drastic remedy and is authorized only when there is a clearly specified ground. State v. Calloway, 343 So.2d 694, 698 (La.1976). See also, State v. Delore, 381 So.2d 455, 460 (La.1980).
The defense accepted McClure as a juror after extensive voir dire examination. Because the first trial ended in a mistrial, defendant knew many of the same State witnesses would testify at the instant trial. However, McClure was not questioned as to possible relationships with State witnesses. In any event, after revealing his acquaintance with Chester Pritchard and answering questions from the trial court, the prosecutor, and defense counsel, McClure stated that he could be a fair and impartial juror. In light of this response, and the limited nature of the relationship in question, we conclude that the acquaintance between juror McClure and Chester Pritchard was not a valid ground for a mistrial. See, State v. Delore, supra; State v. Calloway, supra. See also, State v. Day, 414 So.2d 349, 350-351 (La 1982). Furthermore, we note that Chester Pritchard's testimony was not of decisive importance in this case. Most of it concerned the gathering of evidence at the scene of the shooting.
Finally, contrary to defendant's argument, the trial court found no evidence of prosecutorial misconduct. During voir dire, Chester Pritchard handed a note to one of the prosecuting attorneys disclosing that he knew juror Wayne McClure, although their relationship was limited to telephone business conversations approximately three years earlier. The note did not reveal the weekend hunting trip. The prosecutor stated that he considered such a relationship innocuous and did not feel it necessary to reveal to the defense the fact that Chester Pritchard knew juror McClure. In denying the motion for mistrial, the trial court obviously agreed that this information was innocuous and that there was no need to disclose to defense counsel the existence of such a relationship, nor was there any prejudice to defendant.
For the above reasons, these assignments of error are meritless.
ASSIGNMENT OF ERROR NUMBER THREE:
In this assignment of error, defendant contends that the trial court erred in allowing a State witness, Darwin Givins, to repeat the victim's last words. Darwin Givins arrived at the scene of the shooting shortly after it occurred. He testified that he stayed with the victim and held his hand until the ambulance arrived. At the trial, Darwin Givins testified about some of the last statements made by the victim. He testified that the victim stated: "I'm not going to make it" and "tell Debra and Rusty that I love them." Darwin Givins also testified that the victim stated that Gregory Griffin had shot him and that he had been shot with his own shotgun.
*1149 The defense objected to the statement "tell Debra and Rusty that I love them" on the grounds that it was irrelevant and extremely prejudicial. The defense argued that the prosecution wished to introduce these statements to show that the victim knew he was about to die and that these statements would serve as part of a foundation for a "dying declaration" exception to the hearsay rule. Using these statements as a foundation, the State could introduce the victim's hearsay testimony that the defendant had shot him. However, the defense argued that Gregory Griffin never denied shooting the victim and that he claimed self-defense. Therefore, the defense believed that it was unnecessary to introduce any of the above hearsay testimony as a foundation for a "dying declaration" exception to the hearsay rule.
Darwin Givins' testimony about the victim's last statements was admissible because the statements would qualify as "excited utterances" and "dying declarations." See, State v. Henderson, 362 So.2d 1358, 1362 (La.1978); State v. Vincent, 338 So.2d 1376, 1383-1384 (La.1976). See also, State v. Brown, 395 So.2d 1301, 1307-1308 (La. 1981). Furthermore, the State did not have to rely on the "excited utterance" and "dying declaration" exceptions in order to introduce these statements into evidence. The statements were definitely admissible as res gestae. What forms any part of the res gestae is always admissible in evidence. La.R.S. 15:447 & 15:448. State v. Stucke, 419 So.2d 939, 947-948 (La.1982); State v. Brown, supra.
This assignment of error is meritless.
ASSIGNMENT OF ERROR NUMBER FOUR:
In this assignment of error, defendant contends that there was insufficient evidence to support his conviction of manslaughter. The proper procedural vehicle for raising the issue of the sufficiency of the evidence is by a motion for a post-verdict judgment of acquittal. La.Code Crim. P. art 821; State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983). Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. The standard set forth in article 821 is whether or not, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Additionally, when a defendant claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, 483 So.2d 953, 956 (La.1986).
The defendant contends that he was forced to shoot Deputy Kent in self-defense. He argues that the "compromise verdict" of manslaughter acted as a acquittal on the charge of first degree murder and the responsive verdict of second degree murder. He further argues that, since there is no evidence of manslaughter, the jury should have returned a verdict of not guilty. However, this argument overlooks the fact that there was direct evidence that the defendant became angry and possibly lost his temper immediately prior to the shooting. Marty Guy testified that the defendant's tone of voice changed and that, before he shot Deputy Kent, he demanded to be let out of the patrol car. Knowing that he was confined in the back seat of the patrol car, that he was just arrested, and that his car would be towed away, the jury could have concluded that defendant lost control and shot Deputy Kent. The defendant's statement to Monroe James that he also would have shot Marty Guy if he had not run away when the shooting began is further evidence that the defendant lost his self-control before the incident occurred.
Furthermore, defendant's argument above clearly disregards State v. Schrader, 518 So.2d 1024, 1033-1034 (La.1988), and State ex rel. Elaire v. Blackburn, 424 So. 2d 246 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), which held that, absent a contemporaneous objection, a defendant can not complain if the jury returns with a legislatively approved responsive verdict (such as manslaughter in this case), even where there is not sufficient evidence to support such a verdict, provided the evidence is sufficient *1150 to support the charged offense. In the instant case, there was sufficient evidence to sustain a conviction of the charged offense of first degree murder. State witness Marty Guy testified that he saw defendant fire the first shot. Gorman Gill and Randy Konzelman also testified that they heard an initial shotgun blast, followed by six pistol shots, followed by two more shotgun blasts.
Defendant never claimed that he shot first to prevent Deputy Kent from shooting him. His version of the incident was that Deputy Kent fired first, which forced him to fire the shotgun in self-defense. Nevertheless, the circumstantial evidence in this case (pictures of the crime scene, bullet holes, broken glass, bloodstains, testimony of doctors and firearm experts, wounds of the victim and the defendant, etc.) is inconclusive and can not support defendant's theory of self-defense in light of the direct testimony of three witnesses that defendant fired first. The direct evidence of the State's witnesses is sufficient to prove first degree murder (the charged offense) as well as to negate defendant's claim of self-defense. Therefore, even if there is insufficient evidence to support the responsive verdict of manslaughter, the instant conviction will not be reversed. State v. Schrader; State ex rel. Elaire v. Blackburn.
This assignment of error is meritless.
AFFIRMED.
NOTES
[1] La.R.S. 14:322.1 provides:

A. It shall be unlawful for any person, intentionally and without the consent of all parties to a confidential communication, to eavesdrop upon or record such confidential communication by means of any electronic amplifying or recording device, whether such communication is carried on among such parties in the presence of one another or by means of a telegraph, telephone, or other device.
B. For the purposes of this Section the following definitions shall apply:
(1) "Person" means any individual, business association, partnership, corporation, or other legal entity, including any individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but shall not mean an individual known by all parties to a confidential communication to be recording such communication.
(2) "Confidential communication" means any communication carried on in such circumstances as may reasonably indicate that any party to such communication desires it to be confined to such parties, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other public circumstance in which the parties to the communication may reasonably expect that the communication may be recorded.
(3) "Eavesdropping" means the intentional listening to or recording of a confidential communication, either by human ear or with the aid of any electronic listening device, without a valid search warrant, by a person without the consent of all the persons to the communication.
C. Except as proof in any prosecution for violation of this Section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this Section shall be admissible in any judicial, administrative, legislative, or other proceeding.
D. This Section shall not apply to the following:
(1) To any public utility or public utility holding company or any subsidiary thereof engaged in the business of providing gas, electric, or communications services and facilities, or the officers, employees, or agents thereof, when the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct, or operation of the services and facilities of such public utility.
(2) To the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of such a public utility company.
(3) A law enforcement agency or any of its authorized agents.
(4) To any corporation or other business entity engaged in the provision of products or services to the public, or to the officers, employees, or agents thereof, when the acts otherwise prohibited herein are for the purpose of service quality control or for educational, training, or research purposes and such acts are performed with the consent of one party to the communication being intercepted.
E. (1) Whoever commits the crime of criminal eavesdropping on or recording of confidential communications shall be fined not more than five hundred dollars or imprisoned for not more than six months, or both.
(2) The provisions of R.S. 14:322.1(E)(1) shall not apply to any person transmitting a conversation to protect human life or to any person recording a conversation in which he is the victim of a verbal conversation which is obscene, harassing, or threatening.