STATE OF LOUISIANA

VERSUS

DAVID BOURGEOIS

NO. 23-KP-140

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPLICATION FOR SUPERVISORY REVIEW FROM THE
TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-3418, DIVISION "D"
HONORABLE SCOTT U. SCHLEGEL, JUDGE PRESIDING

May 31, 2023

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
John J. Molaison, Jr., and Cornelius E. Regan, Pro Tempore

**WRIT DENIED; CONVICTIONS AND SENTENCES AFFIRMED**
 **JGG**
 **JJM**

**DISSENTS WITH REASONS**
 **CER**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Susan S. Buchholz
Chief Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/RELATOR,
DAVID BOURGEOIS
Christy M. Howley
M. Elizabeth Bowman
Steven Lemoine

**GRAVOIS, J.**

Defendant, David J. Bourgeois, seeks this Court's supervisory review of his misdemeanor convictions and sentences for violating an Order of Protection (protective order) in violation of La. R.S. 14:79.  For the following reasons, we deny defendant's writ application and affirm his convictions and sentences.

**PROCEDURAL HISTORY**

On August 16, 2022, the Jefferson Parish District Attorney filed a bill of information charging defendant, David J. Bourgeois, with five counts of violating an Order of Protection issued on March 10, 2022 in violation of La. R.S. 14:79.[1] On January 23, 2023, the State dismissed count three and amended count five to change the date of the offense to July 22, 2022.  In the amended bill of information, the State alleged that defendant violated the March 10, 2022 protective order on four dates: count one – April 27, 2022; count two – April 29, 2022; count four – June 10, 2022; and count five – July 22, 2022.  On that same date, a bench trial was held, and the trial court found defendant guilty as charged as to counts one, two, four, and five.  Thereafter on that same date, the trial court sentenced defendant to six months in the parish prison on each count, suspended the "sentence," and placed him on one year of active probation.  The State filed a new Order of Protection prohibiting defendant from having any contact with the victim for two years or until January 23, 2025.

On March 20, 2023, defendant timely filed the instant writ application.

**FACTS**

On March 10, 2022, an Order of Protection was issued as part of defendant's bail restrictions/conditions of release.  The protected person was named as "Shana

---

[1] Defendant was also charged with domestic violence battery in case number 22-984. The battery case and the instant case were tried together on January 23, 2023.  Defendant was found not guilty of domestic violence battery.

Bourgeois."[2]  Defendant was ordered not to do several things; however, the provisions in question are Provision 1, Provision 3, and Provision 5.  In Provision 1, the judge ordered defendant not to abuse, harass, assault, stalk, follow, track, monitor, or threaten Mrs. Bourgeois.  In Provision 3, the judge ordered defendant not to go within 200 feet of Mrs. Bourgeois.  In Provision 5, the judge ordered defendant not to go within 100 yards of the residence or household of Mrs. Bourgeois.  The Order of Protection reflects that the order was valid until final disposition, including refusal, dismissal, acquittal, or sentencing.

Mrs. Bourgeois testified at trial that she had been married to defendant for twenty-two years.  Defendant filed for divorce on March 10, 2022 and the parties are separated.  Mrs. Bourgeois explained that in February of 2022, their relationship was very toxic and they fought often during the entire month of February.[3]  Mrs. Bourgeois provided that they argued about money and his jealously over false cheating allegations he made against her.  She stated that defendant was very controlling and mentally and emotionally abusive during their entire marriage.

On February 21, 2022, defendant came home from work at approximately 6:00 p.m.  Mrs. Bourgeois testified that she and defendant argued about money, after which defendant grabbed her arm and "slung" her to the ground in her bedroom at her residence at 925 South Kenner in Waggaman.  Mrs. Bourgeois did not call the police that night.

On February 22, 2022, defendant came home from work at approximately 6:00 p.m. and locked himself inside the guest bedroom, which was across from Mrs. Bourgeois' bedroom.  Mrs. Bourgeois said she sent defendant a text asking if

---

[2] Mrs. Bourgeois' first name is spelled "Shana" and "Shanan" in the writ application. The Order of Protection indicates that her first name is "Shana."

[3] Mrs. Bourgeois explained that they fought on February 7, 9, 10, 19, 21, and 22.

this was what it had come to. After receiving the text, defendant came "flying" into her bedroom and told her he would "take her out" before she got a dollar of his money. She stated that she was very scared and felt like defendant was going to take her life. Mrs. Bourgeois testified that she then called 9-1-1.[4] While she was waiting for the police, defendant went to her twenty-year-old son, Colby's apartment above her salon in the house and told him to get down there because "[s]he's fixing to lie her ass off." Mrs. Bourgeois stated that defendant told Colby to tell the police that he (defendant) did not lay his hands on her.

Two police officers subsequently came to the house and asked what was going on. Mrs. Bourgeois recalled telling them that she and defendant were fighting. She recalled that Colby came downstairs and lied, telling the officers that he was downstairs and that defendant did not lay his hands on her. Mrs. Bourgeois acknowledged that Colby did not see defendant hit or grab her on February 21, 2022, or threaten her on February 22, 2022. Defendant told the officers he would go to his friend, Jeffrey Ferlandy's house down the street, after which defendant left. Mrs. Bourgeois asserted that the officers took no action and did not ask if she wanted to press charges.

The next day, on February 23, 2022, Mrs. Bourgeois felt uneasy, so she went to the Third District police station and told them she wanted to press charges. Mrs. Bourgeois stated that she met with Deputy Michael Leyva and gave a statement. The deputy also took pictures of her right upper arm where defendant had allegedly grabbed her on February 21, 2022. Mrs. Bourgeois pointed out the bruise on her arm in the photographs. Mrs. Bourgeois testified that she responded affirmatively when the deputy asked if she wanted to press charges. She asserted that defendant

---

[4] The 9-1-1 call was played at trial. It was not included with this writ application.

was arrested on March 7, 2022. She said that the officers told her they could not arrest defendant until they caught him on the premises.

Mrs. Bourgeois asserted that previously on July 10, 2010, she also had to call the police for a fight with defendant that turned physical. She asserted that said fight was also about money or cheating allegations. She explained that defendant had gone through her phone, asking who was this person texting her and why was he texting her. Mrs. Bourgeois recalled telling defendant that this person was texting her for a hair appointment. She claimed that defendant grabbed her and "slung" her against the wall. She stated that when she told him she was going to call the police, defendant said he was going to awaken the kids so they could see him being arrested. Mrs. Bourgeois pointed out that defendant always tried to involve the kids in their disagreements. She called the police that night, but defendant fled the scene before the police arrived. Because of that incident, defendant completed anger management classes.

Mrs. Bourgeois testified that on March 10, 2022, there was a hearing in Commissioner's Court where an Order of Protection was issued. Mrs. Bourgeois testified that defendant continually violated the protective order by going within 200 feet of her. She explained that he would sit across the street, drive down the driveway, sit diagonally across the street, show up at her son's ball game, come up right next to her at her son's ball game and try to intimate her, and cause her house alarms to go off all hours of the night. These incidents happened between March 10 and July 23, 2022. Mrs. Bourgeois testified that she did not report every violation immediately. She asserted that she wanted these incidents to stop, that defendant kept violating the protective order, and that he was getting bolder. As such, she stated that she felt she had no choice but to report the violations.

Mrs. Bourgeois provided that on April 27, 2022, defendant was sitting in his personal vehicle across the street at "Annie and Jay's driveway" across from her

driveway. She stated that defendant had no reason to be at her house on that date. Mrs. Bourgeois testified that on April 29, 2022, defendant was sitting in his truck diagonally across the street in "Rose and Mike White's driveway." She identified State's Exhibit 9 as a photograph that she took of defendant sitting in his truck on that date. She stated that defendant had no reason to be at her house on that date. Mrs. Bourgeois testified that on June 10, 2022, defendant was in the passenger seat of Mr. Ferlandy's truck, which was parked across the driveway blocking her exit. She identified State's Exhibit 10 as a photograph that she took of defendant sitting in the truck on that date. She stated that she did not invite defendant over on that date and that he had no reason to be there. Mrs. Bourgeois testified that on July 22, 2022, defendant again violated the protective order. She identified State's Exhibits 11 and 12 as photographs she took of defendant in his teal Southern Tile shirt driving his brother Terry Bourgeois' gray Ford truck in her driveway on that date.[5] She stated that there was no reason for defendant to be in her driveway on that date and that he was not invited to be there.

Mrs. Bourgeois testified that she gave the State four videos that she took on February 19, 2022.[6] She asserted that on that date, she pushed through defendant's bedroom door. She denied breaking the door down. She explained that on that date, defendant called her a "whore" in front of her kids. Mrs. Bourgeois recalled that defendant kept telling Colby to come and videotape them fighting. Mrs. Bourgeois testified that she heard on one of the tapes that she said she broke his door down, but she explained that she meant that she pushed through the door. She denied saying that she was going to make defendant's life miserable, explaining

---

[5] Mrs. Bourgeois testified that State's Exhibit 10 was not zoomed in, but that State's Exhibit 11 was. She explained that she was on her front porch and wanted to make sure it was defendant, so she zoomed in. She denied trying to make the truck look closer. Mrs. Bourgeois stated that she wanted to make sure that it was defendant in the driveway and to show his Southern Tile shirt.

[6] These videos were admitted into evidence at trial as Defense Exhibits 2 through 5 and played. These videotapes were not included with the instant writ application.

that she was just repeating what he had said to her.  She explained that Colby had opened the door and was videotaping them.

Mrs. Bourgeois testified that she did ask her younger son to ask defendant to take him to school one morning that was not during his visitation time.  She stated that this probably occurred on April 29, 2022.

Deputy Leyva of the Jefferson Parish Sheriff's Office ("JPSO") testified that on February 23, 2022, Mrs. Bourgeois went to the Third District police station and made a complaint of domestic abuse against her husband, Mr. Bourgeois.  Deputy Leyva recalled that Mrs. Bourgeois was startled, scared, and upset.  Deputy Leyva took a statement from Mrs. Bourgeois, after which he took photographs of the bruise on her arm.  Deputy Leyva provided that based on his experience as a deputy, the injury was consistent with a battery.

JPSO Deputy Roberto Babin Jr. testified that on June 18, 2022, he was dispatched regarding the violation of a protective order in the instant case.  He met with Mrs. Bourgeois, who advised him that defendant had violated the protective order multiple times and that she had photographs showing the different incidents.  Deputy Babin stated that he contacted the protective order registry and confirmed that a protective order was active at the time of the offense dates.  He further stated that based on his experience and investigation, four violations had occurred.

Deputy Babin explained that he determined that violations of the protective order had occurred based on photographs of defendant's vehicle in her driveway.  He believed that the protective order reflected that defendant was not allowed at her residence within 100 feet.[7]  When defense counsel asked Deputy Babin if he could tell from the photographs that defendant's vehicle was closer than 100 feet, Deputy Babin responded affirmatively, pointing out that defendant was parked

---

[7] The protective order states that defendant was ordered not to go within 100 yards of the residence or household of Mrs. Bourgeois.

right next to the house on the side in the driveway. When shown State's Exhibits 9 through 12, Deputy Babin testified that those photographs did not depict what he just described. He stated that the "closest one that they have is this one right here (indicating), which is at the end of the driveway." Deputy Babin testified that he did not know how long the driveway was. When defense counsel said the deputy did not know if "that's" more than 100 feet or 100 yards, Deputy Babin responded, "Correct." He denied that he just took Mrs. Bourgeois' word for it that defendant violated the protective order. Deputy Babin explained that Mrs. Bourgeois told him that defendant had picked up one of the children. He thought, "it was in one of the pictures of him picking up said child at her house, 925 South Kenner." When defense counsel said the deputy did not know if that was closer than 100 yards to the house, Deputy Babin responded, "No."

Deputy Babin testified that he was familiar with protective orders and that he was familiar with Provision 1, which prevents defendant from stalking or following Mrs. Bourgeois. He further testified that Provision 5 prohibited defendant from going within 100 yards of the residence or household. Deputy Babin maintained that based on Provision 1, he determined that defendant followed or stalked the victim by showing up at her house. He further maintained that based on Provision 5, he determined that defendant was within 100 yards of the residence. Deputy Babin testified that he made these determinations based on the victim's statement and the photographs she took.

Colby testified that defendant was his father, that Mrs. Bourgeois was his mother, and that he now lived at 330 South Kenner Avenue.[8] In February of 2022, he lived with his parents and his fifteen-year-old brother at 925 South Kenner Avenue. Colby asserted that on or about February 19, 2022, he saw his mother

_____

[8] Colby testified that his date of birth was January 18, 2002.

break in the door of his father's bedroom. He explained that he saw her use her shoulder to bang into the door and try to open it because his father had locked it. Colby also explained that he was in the living room toward the end of the hall approximately twenty-five feet from his father's room when he saw her do this. He stated that it was a loud ram and that she did this approximately three times. Colby recalled that after the third time, the door opened, and his mother fell into the room. He provided that he never heard his mother yelling at his father that he (his father) had grabbed her by the arm and thrown her to the ground.

Colby also testified that when he became aware of a conflict between his parents, he tried to videotape it. Colby explained that he knew "it was all over" and did not know what his mother would try to say about it, so he wanted to video or audio anything he could. Colby asserted that he videotaped her on his cell phone breaking the door down. When his mother saw him do that, she charged at him and took his phone in the hall. He pointed out that he got his phone back a few days later, but that it had been destroyed and would not turn on. Colby testified that he tried to love his mother and that he was not taking sides in the dispute between his parents. He also testified that he did not see a battery occur between his parents. He admitted that he was employed by and paid through his father's company.

Mr. Ferlandy testified that he had known defendant for the past fifty years and had known Mrs. Bourgeois since she and defendant were married. He lived on Lanyon Lane, a quarter or half-mile from where Mrs. Bourgeois lived at 925 South Kenner. Mr. Ferlandy asserted that on or about April 5, 2022, defendant was staying with him. While defendant was there, Mrs. Bourgeois came to his (Mr. Ferlandy's) house late at night while they were sleeping at approximately 1:00 a.m. Mr. Ferlandy recalled hearing tapping and then woke up and heard it again. He did know what it was, so he got up and went to the bathroom window, where he saw

Mrs. Bourgeois. Mr. Ferlandy asserted that Mrs. Bourgeois asked if defendant was there, after which he went and awakened defendant. He asserted that he told defendant that Mrs. Bourgeois was outside. Mr. Ferlandy provided that he did not observe any contact between defendant and Mrs. Bourgeois at that time.

Defendant testified that he and his wife did not have a toxic relationship during their marriage. He stated that their marriage was "pretty good" except for two small incidents. Defendant explained that in February of 2022, he and his wife began quarreling about her infidelity. He explained that she did not want a divorce, but he did. Defendant asserted that they mutually determined to obtain an uncontested divorce, sell everything, and not get a lawyer. He further asserted that his wife blamed Colby for putting ideas in his (defendant's) head about her infidelity. Defendant recalled that she was very angry with him (defendant).

Defendant stated that he locked Mrs. Bourgeois out of his room because she was aggravating him. When he locked his door, he could hear her banging on it like she was charging into the door. After three or four charges, the door flung open, and she came "flying" across the floor and slid into the corner of the bed with her right charging shoulder. Defendant testified that she hurt herself doing this and that she was furious because he had locked the door. He said he knew she hurt herself because it took her a long time to get up off the floor. He stated that he retreated backwards to protect himself.

Defendant remarked that he called Colby to come and videotape the incident because he thought his wife was about to go out of control. He denied grabbing her arm and throwing her to the floor on February 21, 2022. Defendant stated that he took videos on February 19, 2022, because she had just "knocked" through the door. He thought she was capable of anything and would probably blame him, so he wanted it on video. He asserted that he did not fix the door, but that he changed the doorknob because it got damaged when she broke through the door. He denied

having deadbolts on his door. Defendant mentioned that he put a privacy lock on it and that a key was not needed to open it. He stated that she continued to come into his room after the door was broken open.

Defendant testified that he extracted still photographs from the video taken on February 19, 2022. Defendant asserted that those photographs showed a mark on his wife's right arm in the same place that the photographs taken by the JPSO showed.

Defendant testified that he heard his wife testify regarding calling the police in 2010. He explained that his wife had a "fling" with a St. Charles Parish police officer; that she went to sleep, and the police officer texted her; that defendant retrieved her phone and texted the officer back; and that defendant woke his wife up, and they argued. Mrs. Bourgeois went to the bathroom, and while she was sitting there, defendant told her she was going to hear him out. Defendant recalled that she said no and started to get up. He stated that he pushed her back down on the toilet seat, and that she said she was going to call the police. Defendant asserted that he did not intend to injure her. He denied shoving her into a wall. Defendant testified that she called the police, so he left because he explained that nothing good was going to come from it. He stated that he grabbed some clothes and left for a couple of weeks. Defendant asserted that he received a call from the police, who asked him to come in. He went to see someone in the district attorney's office and that he agreed to a diversion program, which involved twenty-five counseling classes, drug tests, and ultimately expungement. He stated that he thought it was a fair and reasonable path forward, so he did it, even though he did not think he did anything wrong.

Defendant testified that with respect to the events after the protective order was issued in March, he never went to her residence at 925 South Kenner with the intent to harass or stalk her. He further testified that he only went in front of the

house on the street or across the street to pick up or drop off his son four or five times. Defendant maintained that he confirmed everything he did with his divorce attorney, Christy Holly, before he did it.

Defendant asserted that on April 27, 2022, one of his sons asked him to take him to his friend's house in New Orleans East, so they could go on a school trip. Defendant stated that he picked up his son and brought him to his friend's house on that date. He explained that his wife asked her son to ask defendant for a ride that day. Defendant testified that on April 29, 2022, his intent was to pick up his son. He provided that the furthest he went was to park at the edge of the road and not go down the driveway. Defendant explained that he could say with a great deal of confidence that the front yard is 100 yards. He recalled joking with his younger son that the front yard was a football-field length, pointing out that he had walked the driveway often to take out the trash and that he and his younger son played football there.

Defendant testified that he never got within 100 yards of the house where his wife was living, including on April 27, April 29, June 10, or July 23, 2022. He stated that he never went down the driveway because his attorney told him not to go any farther than the edge of the road. Defendant asserted that when he was waiting for his son to come outside, he would be parked right off the street for five or ten minutes. Defendant did not recall ever being in Mr. Ferlandy's truck to go and pick up his younger son. Defendant testified that there was at least one occasion when Mr. Ferlandy drove his truck to pick up his (defendant's) younger son at 925 South Kenner. It appeared to him that Mr. Ferlandy's truck is shown in one of the State's exhibits. Defendant admitted that he knew about the protective order on March 10, 2022, and that he was not allowed to go within 300 feet of the residence. He testified that he continued to go 300 feet "from the residence."

Defendant maintained that to his knowledge, he never admitted guilt to anything that happened between him and his wife in 2010.

Thereafter, the State and the defense stipulated that Deputy William Burandt and Deputy Ray Vazquez were dispatched to 925 South Kenner Avenue on February 22, 2022; that they conducted an investigation by speaking to defendant and Colby; and that they took no action after investigating that disturbance.

Following closing arguments, the trial judge stated in pertinent part:

> What is at issue and who is on trial is Mr. David Bourgeois, and the allegations of the State are that on February 21st, David Bourgeois grabbed Mrs. Bourgeois by the arm and flung her to the ground. The Court finds the defendant on those allegations not guilty.

> The Court finds that the burden of the State is to prove beyond a reasonable doubt that Mr. Bourgeois violated 14:35.3, not maybe, not probably, not that he is abusive, both physically, emotionally to his wife, but that he committed a domestic abuse battery, and the evidence presented to this Court provides doubt as it relates to the domestic abuse battery on February the 19th, 2022, two days before the alleged domestic abuse battery.

> The defense has provided photographs and video from an incident wherein the victim clearly has markings on the right arm, and there is clearly a voice of Mrs. Bourgeois saying that she broke in through the door and her own son testified that he saw her ramming the door. That provides reasonable doubt, and Mr. Bourgeois is found not guilty.

> It is also very clear that the State proved beyond a reasonable doubt that he did, in fact, violate the protective order on the alleged dates of April - - give me the dates - - April the 27th, April the 29th, June the 10th, and July the 22nd. The victim testified and provided photographs of the vehicle directly in front of her driveway and catty-corner, diagonal - - however you want to say it - - in the neighbor's driveway. I'm going to be clear, the protective order says a hundred yards from the residence. The Court finds that the residence includes any curtilage of the property, and it is clear that the defendant violated the protective order. Whether he got bad advice from his lawyer or not is irrelevant to this Court. That is a valid protective order signed by Commissioner Patricia Joyce, telling him to stay a hundred yards from the residence. He had violated that on multiple occasions and the Court finds him guilty as charged for violating the protective order.

## LAW AND ANALYSIS

Defendant argues that the evidence was insufficient to support his convictions of four counts of violation of a protective order. Defendant contends that from the evidence submitted by the State, no fact-finder could reasonably infer that defendant was within 100 yards of the residence based on the edited pictures provided. Defense counsel further contends that no fact-finder could find the testimony of Mrs. Bourgeois reasonably credible given her own admissions of editing the pictures by zooming in because the subject was so far away from where she stood near her residence and because she was unsure if the subject was even defendant.

Defense counsel also argues that the trial judge erred as a matter of law in finding that the residence included the curtilage for the purposes of the Order of Protection issued against defendant for several reasons: 1) the constitutional protections of curtilage do not apply to facts similar to those in this matter; 2) if an Order of Protection were to include the curtilage of a residence, it should specify that the curtilage is included; and 3) any finding that the residence included the curtilage by the trial court after issuance of the Order of Protection and without notice beforehand to defendant, would be a violation of due process and similar to unconstitutional *ex post facto* laws.

When reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct, circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 provides, "[A]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." The reviewing court is not required to determine whether a defendant's suggested hypothesis of innocence offers an exculpatory explanation of events. Rather, the reviewing court must evaluate the evidence in the light most favorable to the State and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *State v. Baham*, 14-653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566, *writ denied*, 15-40 (La. 3/24/16), 190 So.3d 1189.

In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703.

Defendant was convicted of four counts of violation of a protective order. At the time of the offenses, La. R.S. 14:79 provided, in pertinent part:

> A.(1)(a)  Violation of protective orders is the willful disobedience of a preliminary or permanent injunction or protective order issued pursuant to R.S. 9:361 *et seq.*, R.S. 9:372, R.S. 46:2131 *et seq.*, R.S. 46:2151, R.S. 46:2171 *et seq.*, R.S. 46:2181 *et seq.*, Children's Code Article 1564 *et seq.*, Code of Civil Procedure Articles 3604 and 3607.1, or Code of Criminal Procedure Articles 320 and 871.1 after a contradictory court hearing, or the willful disobedience of a temporary restraining order or any *ex parte* protective order issued pursuant to R.S. 9:361 *et seq.*, R.S. 9:372, R.S. 46:2131 *et seq.*, R.S. 46:2151, R.S. 46:2171 *et seq.*, criminal stay-away orders as provided for in Code of Criminal Procedure Article 320, Children's Code Article 1564 *et seq.*, or Code of Civil Procedure Articles 3604 and 3607.1, if the defendant has been given notice of the temporary restraining order or *ex parte* protective order by service of process as required by law.

> * * *

> (3) Violation of protective orders shall also include the willful disobedience of the following:

(a) An order issued by any state, federal, parish, city, or municipal court judge, magistrate judge, commissioner or justice of the peace that a criminal defendant stay away from a specific person or persons as a condition of that defendant's release on bond.

In *State v. Fink*, 20-139 (La. App. 5 Cir. 6/1/20), 296 So.3d 1270, 1276-77, the defendant argued that the evidence was insufficient to support his conviction of violation of a protective order. The defendant did not contest that there was a protective order in effect, nor did he contest that he was in the vicinity of the victim's house. Rather, the defendant challenged the deputy's estimate that he was within one hundred yards of the victim's residence, specifically mentioning that the officer did not actually measure the distance. In that case, the trial court heard the officer's testimony that the defendant was within one hundred yards of the victim's house. The deputy testified that he was familiar with the area, as it was within his patrol area for the prior three-and-a-half years and that his estimate of the distance was based upon his knowledge of houses and construction and general knowledge of distance and feet. This Court found the deputy's testimony sufficient to establish that the defendant was located within one hundred yards of the victim's residence. Accordingly, this Court found that the evidence presented was likewise sufficient under the *Jackson* standard to support the defendant's conviction for violation of a protective order.

While we have not located any Louisiana cases regarding whether curtilage is included in an order of protection when it is not specifically stated therein, Louisiana jurisprudence does discuss the law regarding curtilage with respect to the Fourth Amendment.

The curtilage of a home is that "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *State v. Every*, 19-40 (La. App. 5 Cir. 5/23/19), 274 So.3d 770, 778, *writ denied*, 19-1048 (La. 10/1/19), 280 So.3d 159. It is considered part of the home itself and is

therefore afforded Fourth Amendment protection. *Id.* To determine whether an outside area is part of the curtilage or extension of the residence's living area, courts look at four factors which indicate how intimately the area is tied to the home itself: (1) the area's proximity to the home; (2) whether the area is included within an enclosure surrounding the home; (3) whether the area is being used for the intimate activities of the home; and (4) the steps taken by the resident to protect the area from observation by passers-by. *Id.*

Louisiana jurisprudence has indicated that unenclosed driveways, like the driveway in the instant case, are not part of the curtilage with respect to Fourth Amendment cases.

In *Every, supra*, the defendant argued that the trial court erred in finding that the detective lawfully entered the defendant's property and scrutinized the interior of his Mercedes. This Court stated that the photographs of the driveway revealed that the driveway was not enclosed but was entirely open, led to the street, and was the path on which any person would approach the front door of the house and access it from the street. It also stated that the driveway was open to law enforcement officers, as well as any other member of the public. Therefore, this Court found that even if it was a part of the curtilage of the home, this open driveway did not enjoy the same measure of Fourth Amendment protection that a home did, nor that enjoyed by the partially enclosed driveway space where the motorcycle in *Collins v. Virginia*, - - U.S. - - , 138 S.Ct. 1663, 201 L.Ed.2d 9 (2018), was parked and covered by a tarp. As such, this Court found no abuse of the trial court's discretion in denying the motion to suppress.

In *State v. Brown*, 395 So.2d 1301 (La. 1981), the Louisiana Supreme Court upheld the seizure of glass fragments found in the driveway of the defendant's home. The Supreme Court held that the defendant did not have a reasonable expectation of privacy in his driveway since there was nothing in the record to

suggest that the area was fenced, that there was a gate in the driveway, or that easy access was otherwise denied to visitors.

Defense counsel argues that if the Order of Protection included the curtilage, then it should have been specifically stated therein. He contends that this is similar to search warrants in Louisiana that are required to specifically set forth what is being sought.

However, in *State v. Williams*, 13-170 (La. App. 5 Cir. 9/18/13), 125 So.3d 1195, 1198, *writ denied*, 13-2691 (La. 7/31/14), 146 So.3d 545, this Court upheld the search of a vehicle parked in a driveway even though the search warrant did not reference the curtilage, the driveway, or the vehicle. In that case, the defendant argued that the search of the vehicle was beyond the scope of the warrant which only specified the residence at 2020 Fisk Avenue in Marrero. On appeal, the defendant argued that the search of the vehicle was outside the scope of the search warrant. In particular, the defendant contended that the warrant only authorized the search of the residence and in no way referenced "the curtilage, or the grounds, or the premises, or the driveway, or any vehicle that happened to be there." This Court found that the search of the vehicle and the subsequent seizure of the cocaine were valid pursuant to the warrant because it was parked in the driveway of the residence which was the target of the search and which was particularly described in the warrant.

Upon review, we find that a rational trier of fact could have found that the evidence was sufficient under the *Jackson* standard to support defendant's convictions of four counts of violating the protective order. The evidence showed that a protective order was issued on March 10, 2022, and that it was in effect at the time of the offenses listed in the bill of information, namely, April 27, 2022; April 29, 2022; June 10, 2022; and July 22, 2022. In Provision 1, the judge ordered defendant not to abuse, harass, assault, stalk, follow, track, monitor, or

threaten Mrs. Bourgeois. In Provision 5, the judge ordered defendant not to go within 100 yards of the residence or household of Mrs. Bourgeois. At trial, Mrs. Bourgeois testified that defendant violated the protective order on the dates in question and that she took photographs showing these violations. These photographs were admitted into evidence at trial.

Deputy Babin testified at trial that based on his experience and investigation, he determined that four violations had occurred. He further testified that he made this determination based on Mrs. Bourgeois' statement and on photographs she took of defendant's vehicle in or next to her driveway. Deputy Babin maintained that based on Provision 1, he determined that defendant followed or stalked the victim by showing up at her house. He further maintained that based on Provision 5, he determined that defendant was within 100 yards of the residence.

Although it does not appear that Deputy Babin measured the distance between the residence and the places where defendant was seen in a vehicle on four occasions, we find that the evidence was still sufficient under the *Jackson* standard to support the convictions. *See Fink*, *supra*.

Defense counsel contends that the protective order should have specifically instructed defendant not to go within 100 yards of the curtilage, if in fact the order included the curtilage, citing *State v. Kelly*, 160 N.H. 190, 999 A.2d 303 (2010). However, *Kelly* did not involve the issue of whether curtilage had to be specifically included in a protective order. Additionally, as was discussed above, in *Williams*, *supra*, this Court upheld the search of a vehicle parked in a driveway even though the search warrant did not specifically reference the curtilage, the driveway, or the vehicle.

Based on the foregoing, we find that a rational trier of fact could have found that the evidence was sufficient to support the convictions. Mrs. Bourgeois and Deputy Babin testified that defendant violated the protective order on the dates in

question when defendant came within 100 yards of the residence or household. Photographs of the violations were admitted into evidence. However, defendant denied coming within 100 yards of the residence or household on the dates in question. The trial judge evaluated the credibility of the witnesses and found the State's witnesses more credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; the credibility of the witnesses will not be reweighed on appeal. *State v. Rowan*, 97-21 (La. App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.

In conclusion, we find that the arguments made by defendant in his writ application are without merit.

## DECREE

For the foregoing reasons, defendant's convictions and sentences are affirmed. This writ application is denied.

**WRIT DENIED; CONVICTIONS
AND SENTENCES AFFIRMED**

## REGAN, J., DISSENTS WITH REASONS

I have considered the position of the majority, and I respectfully disagree. In my view, defendant's convictions for four counts of violating a protective order, pursuant to La. R.S. 14:79, should be reversed. I believe there is reasonable doubt as to whether defendant came within 100 yards of Ms. Bourgeois' residence.

At trial, Deputy Babin reviewed the photographs Ms. Bourgeois had taken of defendant's truck and other vehicles outside of her residence. He indicated that the photographs showed the closest defendant came to the residence was on the street at the end of her driveway. Deputy Babin testified that he did not know how long the driveway was or if it was more than 100 yards, and he did not know if defendant was closer than 100 yards to the house. The distance cannot be determined from the pictures.

Defendant testified that he would park right off the street and wait for five or ten minutes when he would pick up their son, but he never went within 100 yards of the house where Ms. Bourgeois was living. He stated that he never went down the driveway because his attorney told him not to go any farther than the edge of the road.

The trial judge found that defendant violated the protective order, stating:

> …the protective order says a hundred yards from the residence. The Court finds that the residence includes any curtilage of the property, and it is clear that the defendant violated the protective order.

The curtilage of a home is that "area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *State v. Every*, 19-40 (La. App. 5 Cir. 5/23/19), 274 So.3d 770, 778, *writ denied*, 19-1048 (La. 10/1/19), 280 So.3d 159. The trial judge found that the protective order also included the curtilage, though the protective order did not specifically indicate as

such. However, the case law suggests that unenclosed driveways, like the one in the instant case, would not be part of the curtilage.[9] *See Every*, *supra*; and *State v. Brown*, 395 So.2d 1301 (La. 1981).

Although the majority cites *State v. Fink*, 20-139 (La. App. 5 Cir. 6/1/20), 296 So.3d 1270, in support of its position, the evidence presented in that case was stronger than the evidence in this case. In *Fink*, *supra*, the deputy testified that the defendant was within 100 yards of the victim's residence. He stated that he was familiar with the area because it had been within his patrol area for the past three-and-a-half years and that his estimate of the distance was based upon his knowledge of houses and construction and general knowledge of distance and feet. However, in the instant case, Deputy Babin was not sure of the distance and stated that he did not know how long the driveway was or whether defendant was within 100 yards of the residence.

The evidence did not establish beyond a reasonable doubt that defendant came within 100 yards of Mrs. Bourgeois' residence. Accordingly, the evidence was not sufficient to prove beyond a reasonable doubt that defendant violated the protective order. Therefore, I believe defendant's convictions should be reversed and his sentences should be vacated.

---

[9] The photographs reflect that the driveway was not enclosed or fenced in.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 31, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 23-KP-140

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. SCOTT U. SCHLEGEL (DISTRICT JUDGE)
THOMAS J. BUTLER (RESPONDENT)       CHRISTY M. HOWLEY (RELATOR)       M. ELIZABETH BOWMAN (RELATOR)
STEVEN LEMOINE (RELATOR)

**MAILED**
NO ATTORNEYS WERE MAILED